1  GRAVES LAW OFFICE, P.C.
   Philip J. Graves (SBN 153441)
2  pgraves@graveslawpc.com
   James Ahn (SBN 243335)
3  jahn@graveslawpc.com
   Fredricka Ung (SBN 253794)
4  fung@graveslawpc.com
   12121 Wilshire Blvd., Ste. 775
5  Los Angeles, California 90025
   Telephone:   (310) 295-6500
6  Facsimile:    (310) 295-6501

7  Attorneys for Defendant
   ATHENA COSMETICS, INC.
8

9
                  **IN THE UNITED STATES DISTRICT COURT**
10
                    **CENTRAL DISTRICT OF CALIFORNIA**
11

12
   ALLERGAN, INC., a Delaware corporation,     Case No. SACV07-1316JVS
13 and MURRAY A. JOHNSTONE, M.D., an
   individual,                                  **DEFENDANT ATHENA COSMETICS,**
14                                               **INC.'S OPPOSITION TO PLAINTIFFS**
                                                 **ALLERGAN, INC. AND MURRAY A.**
15               Plaintiffs,                     **JOHNSTONE, M.D.'S OPENING**
                                                 **CLAIM CONSTRUCTION BRIEF**
16      vs.
   CAYMAN CHEMICAL COMPANY, a                    **HEARING:**
17 Colorado corporation; JAN MARINI SKIN
   RESEARCH INC., a California corporation;      Date: April 27, 2009
18 ATHENA COSMETICS, INC., a Nevada             Time: 3:00 p.m.
   corporation; ATHENA BIOSCIENCE, LLC,         Place:  Courtroom 10C
19 a limited liability company; INTUIT
   BEAUTY, INC., a Nevada corporation;
20 PHOTOMEDEX, INC., a Delaware
   corporation; PROCYTE CORPORATION, a
21 Washington corporation; COSMETIC
   ALCHEMY, LLC, a limited liability
22 company; and GLOBAL MDRx, a Nevada
   corporation,
23
                 Defendants.
24

25

26

27

28

## I.    TERMS FOUND IN BOTH THE '404 AND '105 PATENTS

### A.    The Preambles Are Not Limiting

#### 1.    The Preambles Merely Recite An Intended Result That Is Inherent In The Prior Art

The heart of Allergan's argument is its contention that "the intended purpose for using the disclosed compounds – to stimulate hair growth – *is* the invention." This assertion is, however, ungrounded in any actual analysis of the claims or the caselaw. Fatally for Allergan, the Federal Circuit has taken exactly the opposite position, repeatedly holding that preambles are not limiting "where the patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Symantec Corp. v. Computer Assocs. Int'l Inc.,* 522 F.3d 1279, 1288 (Fed. Cir. 2008) (quoting *Catalina Mktg. Int'l v. Coolsavings.com, Inc.,* 289 F.3d 801, 808 (Fed. Cir. 2002); *see Bristol-Myers Squibb Co. v. Ben Venue Labs.,* 246 F.3d 1368, 1375 (Fed. Cir. 2001). The structurally complete invention, *i.e.,* the single step of applying the recited compound to mammalian skin, lies only in the body of the claims.

There is controlling authority directly on point that forecloses Allergan's argument. As Athena explained in detail in its opening brief, the Federal Circuit addressed this very issue as applied to claims that were structurally indistinguishable from those at issue here in *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368 (Fed. Cir. 2001). In *Bristol-Myers*, the Federal Circuit rejected the plaintiff's contention that the preambles were limiting, because "this language is only a statement of purpose and intended result. The expression does not result in a manipulative difference in the steps of the claim." *Id.* at 1376.

The recent case of *King Pharmaceuticals, Inc., et al., v. Eon Labs, Inc.*, 593 F.Supp.2d 501, 507 (E.D.N.Y. 2009) is also instructive. In *King Pharmaceuticals,* the preamble at issue recited "[a] method of increasing the oral bioavailability of metaxalone to a patient receiving metaxalone therapy comprising . . . ." *Id* at 506. The *King*

1  *Pharmaceuticals* court held that the preambles were non-limiting because they merely
2  stated the purpose or intended use of the invention and that the preambles did not result in
3  a manipulable difference in the steps of the claim. *Id* at 507. Here, the preambles state
4  the intended purpose of stimulating hair growth. Deletion of the preambles would not
5  result in any manipulable difference in the recited steps, concentration, or composition of
6  the invention. Accordingly, the preambles are not limiting. *E.g., Catalina Mktg. Int'l v.*
7  *Coolsavings.com, Inc.,* 289 F.3d at 808.

8       Thus, while Allergan suggests that the preambles state a "new use for previously
9  known compounds," this is incorrect. The preambles do not state a method of use; they
10 state a purpose or intended result, nothing more. The use, *i.e.* the steps of the process, are
11 recited in the body of the claim. There is nothing in the preambles that describes how to
12 use anything to accomplish the stated purpose; for that, one must turn to the body of the
13 claims. As in *Bristol-Myers*, and the other cases cited, this is insufficient to render the
14 preambles limiting.

15      Thus, it is simply irrelevant that the '105 and '404 Patents seek to claim uses of
16 previously known PGF compounds and prostamides, or that "hair growth" is referenced in
17 their titles, or that the specifications state that the object of the inventions was to stimulate
18 hair growth. None of this suffices to support Allergan's bare assertion that the preambles
19 are "integral to the invention" – an assertion that is completely ungrounded in any
20 analysis of the claims, which is what is required by the Federal Circuit authority.
21 Similarly, Allergan's assertion that "the body of the claims does not set forth the invention
22 at all" is yet another sweeping statement unsupported by any analysis of the claims.
23 Allergan appears to peg its position on the observation that the preambles state the
24 intended purpose of applying the PGF compounds to the skin. However, this cuts against
25 Allergan's argument, because the Federal Circuit has repeatedly held that a mere
26 statement of purpose is insufficient to render a preamble limiting. *Symantec Corp. v.*
27 *Computer Assocs. Int'l Inc.,* 522 F.3d at 1288; *Bristol-Myers Squibb Co. v. Ben Venue*

28

*Labs.,* 246 F.3d at 1375. This makes sense, because patent infringement is a strict liability tort – it simply does not matter whether the accused infringer applied a product containing the compound to his skin for the purpose of growing hair, or curing acne, if he practices the limitations in the body of the claim he will infringe all the same. *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381 (Fed. Cir. 2007). Accordingly, it simply does not matter whether anyone would apply the compounds recited in the claims to the skin without knowing the purpose. Patents are not marketing brochures.

Allergan's assertion that a proper application of claim construction principles would render virtually pharmaceutical patents invalid is similarly specious. This is pure speculation, unsupported by any authority or analysis. For example, it is well established that a method patent can disclose novel steps to avoid anticipation by prior composition or method patents. *See Catalina Mktg. Int'l v. Coolsavings.com, Inc.,* 289 F.3d at 808 (step of applying shoe polish *to scalp* constitutes a novel step over applying shoe polish *on shoes*). This example is sufficient to put paid to Allergan's parade of horribles.

### 2. "Effective Amount" Is Not A Limitation And Requires No Antecedent Basis

Allergan next contends that the preambles are limiting because they provide antecedent basis for "effective amount." *See Eaton Corp. v. Rockwell Int'l Corp.,* 323 F.3d 1332, 1339 (Fed. Cir. 2003). This argument fails because, as Athena showed in its opening brief, "effective amount" is not a limitation and thus requires no antecedent basis. *Bristol-Myers*, 246 F.3d at 1375.

Allergan relies on *Jansen v. Rexall Sundown,Inc.*, 342 F.3d 1329 (Fed. Cir. 2003). However, this case is distinguishable because it held the preamble to be limiting on an antecedent basis theory. The *Jansen* Court explained that the preamble phrase "treating or preventing macrocytic-megaloblastic anemia" gave meaning to the claim body phrase "to a human in need thereof," and that these phrases were limiting because they were added to overcome prior art during prosecution. *Id* at 1334. Here, conversely, "effective amount" was not added to the claim to overcome prior art. It is therefore not a limitation, obviating

1   any antecedent basis.

2       Similarly, in *Manning v. Paradis*, 296 F.3d 1098 (Fed. Cir. 2002), the Federal

3   Circuit held that "a method of treating a subject in cardiac arrest" was limiting because the

4   term "treating" requires not just any person, but specifically a "subject in cardiac arrest."

5   *Manning v. Paradis*, 296 F.3d at 1102-04. In holding that the preamble was limiting, the

6   *Manning* Court found it significant that the claim did not just recite "a method of

7   delivering oxygen to the heart of a subject." *Id* at 1102. Moreover, the claim body recited

8   "said subject," which requires antecedent basis on the preamble's "subject in cardiac

9   arrest." *Id* at 1104. In this case, the claims do not "treat a subject in need of stimulation

10   of hair growth." The preambles in this case generally call for stimulating hair growth, not

11   treatment of any condition in any particular class of individuals.

12       Again, in *Griffin v. Bertina*, 285 F.3d 1029 (Fed. Cir. 2002), the Federal Circuit

13   held that the preamble was limiting because it gave "life and meaning" to the

14   manipulative steps. *Griffin v. Bertina*, 285 F.3d at 1033. The *Griffin* Court found it

15   significant that the "test subject" limitation appearing in the body of the claim would be

16   rendered meaningless if the preamble was not limiting. *Id.* This is essentially another

17   antecedent basis argument. As stated above, in this case, "effective amount" is not a

18   limitation and requires no antecedent basis. Therefore, *Griffin* is distinguishable from the

19   facts of this case.

20       **3.**     **Johnstone Did Not Rely on the Preambles to Distinguish the**
21               **Claimed Inventions From the Prior Art**

22       The prosecution history of the '105 patent does not reflect any reliance upon the

23   preambles to distinguish the claims from the prior art. Indeed, far from relying on the

24   preambles to distinguish the prior art, when presented with the opportunity, Johnstone did

25   just the opposite - he abandoned <u>structure</u> (families of prostaglandins referred to as

26   "PGA" and "PGE") in an effort to distinguish the Japanese Patent Publication Serial No.

27   61-218510(A) ("JP '510 Publication"), rather than rely on the preambles to attempt to do

28   so. (Ex. 3, Ahn Decl., ¶ 4, 1/3/2001 Amendment, p. 6). Allergan's observation that

DEFENDANT ATHENA COSMETICS, INC.'S OPPOSITION TO PLAINTIFFS ALLERGAN, INC.
AND MURRAY A. JOHNSTONE, M.D.'S OPENING CLAIM CONSTRUCTION BRIEF

1    Johnstone cancelled certain composition claims is a non sequitur, as the limitations in the

2    body of the claims were fundamentally different.  Thus, there is simply nothing in the

3    prosecution history reflecting any reliance on the preambles to overcome prior art.

4         Similarly, the prosecution history of the '404 patent does not reflect any reliance

5    upon the preambles to distinguish the claims from the prior art.  In fact, it reflects exactly

6    the opposite.  The PTO examiner cited two references against the claims of the '404

7    Patent.  The first reference cited was the '105 Patent, which, of course, teaches and claims

8    the application of prostaglandin compounds to the skin for the purpose of stimulating hair

9    growth.  The second was U.S. Patent No. 5,280,018 ("the Ritter Patent"), which disclosed

10   "the use of prostaglandins commensurate with the scope with the formulae of instant

11   claims for treatment of alopecia (abstract, col.1)."  (Ex. [  ], [  ] Decl., ¶ [ ], 5/30/2006

12   Office Action, pp. 2-3).  When faced with the challenge of overcoming these prior art

13   references, the applicants did not argue that the preambles of the '404 Patent claims

14   distinguished over the prior art, but rather submitted a declaration touting the alleged

15   novelty of a "prostamide" over "prostaglandins."  (Ex. 4, Ahn Decl., ¶ 5, Woodward

16   Declaration, p. 2).  Because the preambles of the '105 Patent claims are identical to the

17   preambles of the '404 patent, and because the Ritter reference also disclosed a method of

18   stimulating hair growth, reliance upon the preambles would have been of no avail in

19   distinguishing these references from the claims recited in the '105 patent.  The applicants

20   relied upon the alleged novelty of "prostamides" over "prostaglandins," and not upon the

21   preambles, to distinguish the claimed invention from the '105 patent and the Ritter

22   reference.  Allergan's assertion to the contrary is simply false.

23        **B.    "an effective amount" (claims 1, 5 & 9)**

24        Allergan asserts that "effective amount" should not be limited to any specific

25   numerical range.  This actually supports Athena's position that "effective amount" is not

26   limiting. According to *Bristol-Myers*, it is the actual numerical ranges disclosed in the

27   claims and the specification that are limitations.  *Bristol-Myers Squibb Co. v. Ben Venue*

28

DEFENDANT ATHENA COSMETICS, INC.'S OPPOSITION TO PLAINTIFFS ALLERGAN, INC.
AND MURRAY A. JOHNSTONE, M.D.'S OPENING CLAIM CONSTRUCTION BRIEF

*Labs.,* 246 F.3d at 1375.  ("The express dosage amounts are material claim limitations; the statement of the intended result of administering those amounts does not change those amounts or otherwise limit the claim.")  Here, "effective amount" is merely a statement of intended result that does not limit the claim.  Allergan incorrectly implies that *Bristol* requires that "effective amount" must be duplicative of the amount recited in "the same claim" in order to be non-limiting.  To the contrary, *Bristol* highlights the relevant portion of the <u>specification</u> disclosing the actual numerical range, holding that "an antineoplastically effective amount" is a duplicative statement of intended result that is not limiting.  *Id.*

Moreover, Allergan's proposal that the term be reconfigured as "a dose" rather than as "an amount" finds no support in the claim language or the specification.

## II.  <u>TERMS FOUND IN THE '404 PATENT</u>

### A.  <u>"X is –N(R$^4$)$_2$" (claims 1, 5 & 9)</u>

Allergan asserts that "X" need not include two identical R$^4$ elements.  This construction, however, ignores the most basic principle of claim construction: that the claims are construed as one of skill in the art would understand them.  *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313-14 (Fed. Cir. 2005).  It is well understood in organic chemistry that subscripts <u>always</u> represent a multiplication of the particular group or atom to which they are attached.  (Merlic Decl. ¶ __, Ex. [Naming Organic Compounds: A Systematic Instruction Manual])  This naming convention established by the International Union of Pure and Applied Chemistry ("IUPAC") applies even when the subscript is attached to a group that is represented by a variable.  (Merlic Decl. ¶ __)  Thus, the subscript "2" in  "–N(R$^4$)$_2$" represents multiplication of R$^4$.  (Merlic Decl. ¶ __)  The prime (') symbol is used by chemists to unambiguously denote that the primed variable may be different from the non-primed variable.  (Merlic Decl. ¶__)  The absence of a primed variable in "X is –N(R$^4$)$_2$" unambiguously indicates to one of skill in the art that the two R$_4$ groups must be identical.  (Merlic Decl. ¶ __)

1  Allergan attacks Dr. Merlic's declaration as "conclusory" and "unsupported."

2 However, it is difficult to see how this could be so, in light of the fact that Dr. Merlic's

3 opinion concerning the definition of "X" is based squarely in the IUPAC manual, which is

4 used by chemists worldwide to understand nomenclature (such as subscripts) in the

5 chemical arts. In addition, this was not the "sole" source that Dr. Merlic relies on in

6 support of his opinion that R4 must be identical. (Ung Decl. ¶ __, Merlic Depo. Tr. at

7 16:17-17:14) Allergan also criticizes Dr. Merlic's opinion that the distinction between the

8 claim language describing $R^4$ and the claim language describing $R_1$ and $R_2$ demonstrates

9 that R1 and R2 need not be identical, but that the two R4 elements **must** be identical.

10 Allergan argues that $R_1$ and $R_2$ are distinguishable from $R^4$ because they are located at

11 different positions in the compound (C9 and C11). However, the two $R^4$s are also on

12 different positions on the compound. They are bonded to the nitrogen atom at two

13 different positions.

14  Allergan relies heavily on the fact that bimatoprost, the preferred embodiment,

15 includes two R4 elements that are not identical, in two different ways. First, Allergan

16 contends that claim 4 (which expressly claims bimatoprost) would be invalid if claim 1

17 were construed to require that the R4 elements be identical. The short response to this

18 observation is that it is both correct, and immaterial. The Federal Circuit has repeatedly

19 held that claim terms are to be construed pursuant as one of skill in the art would

20 understand them, regardless of whether the correct construction would result in

21 invalidation of the claim. *Phillips v. AWH Corp., et al.*, 415 F.3d 1303, 1321 (Fed. Cir.

22 2005); *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999) ("If the only claim

23 construction that is consistent with the claim's language and the description renders the

24 claim invalid, then the axiom does not apply and the claim is simply invalid"); *Cross

25 Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1304 (Fed. Cir.

26 2005). The sole case relied on by Allergan to support its position, *Robotic Vision Sys. V.

27 View Eng'g, Inc.*, 189 F.3d 1370 (Fed. Cir. 1999), is distinguishable because there, the

28

DEFENDANT ATHENA COSMETICS, INC.'S OPPOSITION TO PLAINTIFFS ALLERGAN, INC.
AND MURRAY A. JOHNSTONE, M.D.'S OPENING CLAIM CONSTRUCTION BRIEF

1  proper construction of the claim term was not clear even when the court applied the

2  ordinary and customary meaning of the disputed terms, *Robotic Vision*, 189 F.3d at 1375,

3  whereas here, the ordinary meaning of the term "X is –N(R4)2" is governed by well-

4  established guidelines naming chemical compounds.

5      Second, Allergan asserts that "X" must be construed to include two non-identical

6  R4 elements because the specification discloses bimatoprost as the preferred embodiment.

7  Again, this is both correct and irrelevant.  The correct construction of "X" will not read

8  bimatoprost out of the claims, because bimatoprost will still be covered by independent

9  claims 15 and 16 of the '404 Patent, which expressly recite the molecule.  Furthermore,

10  the patentee's disclosure of bimatoprost as is the preferred embodiment of the '404 Patent

11  would not change this analysis even if there were no independent claims directed to

12  bimatoprost.  *Lucent Technologies, Inc. v. Gateway, Inc.*, 525 F.3d 1200 (Fed. Cir. 2008)

13  is directly on point.  In *Lucent Technologies*, the Federal Circuit affirmed a claim

14  construction that ignored the preferred – indeed the only – embodiment, where the claim

15  was unambiguous.  The court explained that "where the claim language is unambiguous,

16  we have construed the claim to exclude all disclosed embodiments" *Id.* at 15 (citing *Chef*

17  *Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1373-74).  Here, the term "X is –N($R^4$)$_2$"

18  is unambiguous to one of skill in the art because its construction is governed by

19  universally-accepted chemical nomenclature.  The cases cited by Allergan are

20  distinguishable because none of the claim terms at issue in those cases were governed by

21  well-established guidelines naming chemical compounds.

22      Allergan's assertion that the communications between the PTO and the inventors

23  during the prosecution show that $R^4$ need not be identical is spurious.  First, the Court will

24  search the prosecution history in vain for any mention by the examiner of R4 as a basis to

25  distinguish the '404 Patent from prior art.  It never happened.  Second, the examiner's

26  statement that latanoprost (the preferred embodiment of the '105 Patent) and bimatoprost

27  differ because bimatoprost "comprises an ethyl amide" does not demonstrate the

28

DEFENDANT ATHENA COSMETICS, INC.'S OPPOSITION TO PLAINTIFFS ALLERGAN, INC.
AND MURRAY A. JOHNSTONE, M.D.'S OPENING CLAIM CONSTRUCTION BRIEF

examiner's understanding of $R^4$ and is, therefore, completely irrelevant for purposes of claim construction.

Allergan also makes much of the fact that Athena filed patent applications including the same nomenclature.  However, these patents are irrelevant to the construction of the claims in these patents because they are different patents filed by different inventors long after the '105 and '404 Patents were filed. Tellingly, Allergan cites to no authority to support its contention that this Court may consider these applications in construing the claims of the patents-in-suit.  Moreover, these patent applications are also irrelevant because the language "X is –N(R4)2" appears only in the specification of the patent applications and is not actually recited in any of the claims.

Finally, the PowerPoint presentation Allergan submitted with its Opening Brief that was purportedly created by someone from the PTO is irrelevant and inadmissible.  First, Allergan requests that this Court consider this exhibit without having provided even the most basic information about it, such as when it was created, why it was created, and to whom it was presented.  This inquiry is relevant, because, for example, a claim is to be construed according to how one of skill in the art would understand as of the date the application was filed.  Second, the content of the presentation demonstrates that it was likely made to illustrate how a PTO examiner should conduct prior art searches; the presentation does not discuss how an examiner should construe a variable like $R^4$.  Third, the presentation is not authenticated and is, therefore, inadmissible. Fed. R. Evid. 902; Fourth, the presentation constitutes inadmissible hearsay. Fed. R. Evid. 802.  Thus, the Court should reject Allergan's attempt to proffer inadmissible evidence.

## B.    "hydrocarbyl aryl radical" (claims 1, 5 & 9)

Allergan's proposed construction of "hydrocarbyl aryl" conflates the definition of "aryl" as that term is understood by one of skill in the art and renders "hydrocarbyl" superfluous.

First, Allergan's own admissions foreclose its proposed construction.  Allergan

admits that the term "hydrocarbyl aryl radical" refers to a class of aryl groups whose ring

atoms are all carbon.  (Allergan's Opening Brief at 19:3-4)  Allergan also admits that a

"hydrocarbyl aryl group" that has "something else" attached to the ring is no longer a

hydrocarbyl aryl group, but is something else entirely: a "substituted" hydrocarbyl aryl

group."  (*Id.* at 19:4-6)  It goes unmentioned by Allergan that the "something" that is

attached to each of the ring atoms of an unmodified hydrocarbyl aryl radical is a hydrogen

atom or a group consisting of only hydrogen and carbon.  (Merlic Decl. ¶__)  This is

sufficient in itself to foreclose Allergan's argument, because the claim does not recite a

"substituted" hydrocarbyl aryl group or radical; it simply recites a standard unmodified

"hydrocarbyl aryl radical."  This is significant, because the patentee expressly used the

term "substituted" elsewhere in the claim to signify the substitution of a hydrogen atom

that would normally be bonded to a carbon with a different atom or group.  ('404 Patent,

col. 14:19-21 ("A . . . may be interrupted by one or more oxo radicals and *substituted* with

on or more hydroxyl . . . .") (emphasis added))  The expression of a limitation in one

element of a claim implies the exclusion of that term in other elements of the claim."

*Novo Nordisk v. Eli Lilly & Co.,* 1999 U.S. Dist. LEXIS 18690 at *52 (holding that

although the claim language used the transition "comprising," the claim cannot

encompass more than "two zinc ions" because the claim used the term "at least" only to

"three phenolics," and not to "two zinc ions.") (citing *Modine Mfg. Co. v. U.S. Int'l Trade

Comm'n*, 75 F.3d 1545, 1551(Fed. Cir. 1996)).  Thus, the patentee's use of the term

"substituted" in other claim limitations, combined with the absence of the term here,

precludes a construction of "hydrocarbyl aryl" that encompasses substitutions.

   Tellingly, in characterizing Athena's position, Allergan merely sets up a straw man

in order to knock it down.  Athena does not contend that non-carbon atoms cannot be

attached to the ring.  To the contrary, Athena contends that hydrogen is the only other

atom other than carbon that may be a part of a hydrocarbyl aryl – exactly as the term

"hydrocarbon" is understood in organic chemistry.  As explained by Dr. Merlic, the term

"hydrocarbyl" stems from "hydrocarbon," which is a compound that contains only carbon and hydrogen. (Ung Decl., ¶ __, Merlic Depo. 77:11-15) Allergan does not dispute that the term "hydrocarbon" refers to compounds that contain only carbon and hydrogen. The word "hydrocarbyl" in the claim therefore limits the aryl radical to include only hydrogen and carbon atoms. (Ung Decl., ¶ __, Merlic Depo. 77:11-15) *See Novo Nordisk v. Eli Lilly & Co.*, 1999 U.S. Dist. LEXIS 18690 *52 (D. Del. 1999) (citing *Warner-Jenkinson Co.* 520 U.S. 17, 29 (1997)) ("Each term in each claim must be given meaning.") Accordingly, the term "hydrocarbyl aryl" refers to a smaller subset of aryl radicals in which the ring is only made up of carbon and the substituent group(s), if any, consist of only carbon and hydrogen. In other words, a "hydrocarbyl aryl" must contain carbon <u>and</u> hydrogen, but no other atom.

Thus, it is not surprising that, as Allergan observes, the "claims do not state that only carbon and hydrogen atoms may be attached to the ring." While the claims do not "state" this, the use of the term "hydrocarbyl aryl" renders it unnecessary to do so, because a "hydrocarbyl aryl" by its nature only encompasses a ring – *including substituents* – that consists of carbon and hydrogen atoms only. (Merlic Decl. ¶ __)

Allergan misrepresents Dr. Merlic's testimony and asserts that "if one of the hydrogen atoms bonded to the ring atoms is substituted with a non-hydrogen or non-carbon element, the classification of the aryl group does not change." This is false. Chemists have developed a nomenclature for exactly such substitution, which is why literature exists describing, for example, "aryl fluorides" (H substituted for Floride), "aryl bromides" (H substituted for Bromine), "aryl iodides" (H substituted for Iodine), and "aryl nitriles" (H substituted for Nitrogen). (Ung Decl. ¶ __, Ex. __) Such precise nomenclature is not surprising; precision is the primary goal of chemical nomenclature even if it was only a secondary consideration in the drafting of the asserted claims.

Second, Allergan's bare assertion that the term "having from four to ten carbon atoms" is intended to be open is nothing but red herring. Any substituent on the

1    "hydrocarbyl aryl" group must consist of only carbon and hydrogen because the

2    transitional phrase "consisting of" is presumed to be closed-ended, i.e., it excludes any

3    element, step, or ingredient not specified in the claim.  *See AFG Indus. v. Cardinal IG*

4    *Co.,* 239 F.3d 1239, 1245 (Fed. Cir. 2001) (citing *PPG Indus. v. Guardian Indus. Corp.*,

5    156 F.3d 1351, 1354 (Fed. Cir. 1998);  MPEP 2111.03 (citing *In re Gray*, 53 F.2d 520, 11

6    USPQ 255 (CCPA 1931); *Ex parte Davis*, 80 USPQ 448, 450 (Bd. App. 1948); *Novo*

7    *Nordisk v. Eli Lilly & Co.*, 1999 U.S. Dist. LEXIS 18690 at *53 ("in the context of

8    chemical patents, 'consisting of' indicates closed claim language and closes the claim to

9    the inclusion of unrecited elements, except for impurities ordinarily associated

10    therewith.").  Claims 1, 5 and 9 recite that an "aryl radical" is "selected from the group

11    *consisting of* hydrocarbyl aryl and heteroaryl radicals."  ('105 patent, 14:22-24) (emphasis

12    added).  The term "having," which comes after the term "consisting of" only refers to the

13    number of carbon atoms and does not open up the claim term.  The phrase "consisting of"

14    precludes any non-hydrogen and non-carbon substituents on the "hydrocarbyl aryl" group

15    because they are not recited in these claims.  Therefore, "hydrocarbyl aryl radical" means

16    that the aromatic ring and any groups attached to the ring must consist of only carbon and

17    hydrogen atoms.

18        Third, contra Allergan, the language of other claims does not compel adoption of a

19    construction that flies in the face of the claim language.  While claim 3 does recite a group

20    of substituents that includes atoms other than hydrogen, this does not compel a

21    construction of claim 1 that is broader than the claim language will allow, but rather

22    compels the conclusion that claim 3 is invalid as seeking to encompass scope that exceeds

23    the scope of its base claim.  *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438

24    F.3d 1374, 1380 (Fed. Cir. 2006) ("Thus, reading an additional limitation from a

25    dependent claim into an independent claim would not only make that additional limitation

26    superfluous, it might render the dependent claim invalid.")

27        Furthermore, "a claim which depends from a claim which "consists of" the recited

28

DEFENDANT ATHENA COSMETICS, INC.'S OPPOSITION TO PLAINTIFFS ALLERGAN, INC.
AND MURRAY A. JOHNSTONE, M.D.'S OPENING CLAIM CONSTRUCTION BRIEF

1  elements or steps cannot add an element or step."  MPEP 2111.03.  Claim 3 depends from
2  claim 1 and therefore "shall be construed to incorporate by reference all the limitations [of
3  claim 1]."  35 U.S.C. § 112, ¶ 4.  Because "hydrocarbyl aryl" is closed in claim 1, claim 3
4  cannot add any elements not recited in claim 1.  Thus, any "contradiction" between claim
5  1 and claim 3 is easily resolved – claim 3 is invalid.

6         Finally, Allergan again trots out the tired horse of Athena's patent application.  The
7  patent applications filed by Athena are of little relevance here.  First, the patent
8  applications are irrelevant to claim construction in this case because they are different
9  patents drafted by a different patentee and filed at a later date.  Second, the term
10  "hydrocarbyl" appears only in the specification and not any of the claims, thus it does not
11  serve as a limitation to the term "aryl" as it does in the claims of the '404.  Third, the term
12  "consisting of" in claim 1 of the '404 Patent, which closes the term "hydrocarbyl aryl"
13  and excludes "substituted hydrocarbyl aryl," is omitted in the two patent applications.
14  Thus, there is no conflict between Athena's position here and in the two patent
15  applications.

### III.   TERMS FOUND IN THE '105 PATENT

**A.    "D is a chain having from 1 to 10 carbon atoms, optionally substituted with one or more –OH groups" (claims 1, 5 & 9)**

19         Allergan construes this claim language to mean: "a chain of one to ten carbon
20  atoms, which may or may not have one or more hetero atoms (oxygen, sulfur, and/or
21  oxygen) as a part of the chain."  This construction is erroneous, because it expands the
22  scope of the claim to incorporate an embodiment that was disclosed in the specification
23  but <u>not</u> recited in the claim itself.

24         Allergan argues that the inventor would have used the term "alkyl" to designate the
25  chain if he had intended it to only include carbon atoms.  This is a distinction without a
26  difference.  An "alkyl" is nothing but a chain of saturated carbon atoms with hydrogen
27  substituents – in other words, it is synonymous with "a chain having from 1 to 10 carbon
28  atoms . . . ."  (Merlic Decl.)  Moreover, Allergan's assertion that Dr. Merlic "admits"

DEFENDANT ATHENA COSMETICS, INC.'S OPPOSITION TO PLAINTIFFS ALLERGAN, INC.
AND MURRAY A. JOHNSTONE, M.D.'S OPENING CLAIM CONSTRUCTION BRIEF

1    some distinction between the two is simply false.  The only distinction made by Dr.

2    Merlic is that (1) "alkyl group" appears on column 26, line 5 to describe $R_1$, (2) "lower

3    alkyl chain" appears on column 26, line 10 to describe "C," and (3) the word "alkyl

4    group" or "alkyl chain" does not appear on column 26, lines 15-16.  (Ahn Decl., __, Ex.

5    __, Merlic Depo., 90:10-92:8).  A mere recognition that "alkyl" requires only carbon

6    atoms on the chain does not militate that "D chain" must allow heteroatom interruptions.

7    Thus, there is simply no support for Allergan's assertion of a "distinction" that is material

8    in some way to claim construction.

9         Allergan next contends that the term "having" is open, enabling the term to be read

10   to include any number of different types of heteroatoms in the "D" chain.  This is

11   incorrect, construing "having" as open-ended renders the subsequent claim language

12   "optionally substituted with one or more –OH groups" meaningless and superfluous.

13   *Novo Nordisk v. Eli Lilly & Co.*, 1999 U.S. Dist. LEXIS 18690 *52 (D. Del. 1999) ("Each

14   term in each claim must be given meaning.") (citing *Warner-Jenkinson Co.* 520 U.S. 17,

15   29 (1997)).  This is because if "chain of one to ten carbon atoms" is construed to be open,

16   then the phrase would encompass a virtually infinite number of atoms in the chain,

17   unlimited as to the type of atoms, so long as there is at least one carbon atom in the chain.

18   Such a construction of "D" would encompass carbon atoms substituted with –OH groups,

19   and the "optionally substituted with one or more –OH groups" limitation, as well as a

20   virtually infinite variety of other substitutions and interruptions, would fall within the

21   scope of these nearly boundless claims.

22        Moreover, the "optionally substituted" limitation is employed three times in each of

23   claims 1, 5 and 9.  The expression of a limitation in one element of a claim implies the

24   exclusion of that term in other elements of the claim.  *Novo Nordisk v. Eli Lilly & Co.,*

25   1999 U.S. Dist. LEXIS 18690 at *52 (holding that although the claim language used the

26   transition "comprising," the claim cannot encompass more than "two zinc ions" because

27   the claim used the term "at least" only to "three phenolics," and not to "two zinc ions.")

28

DEFENDANT ATHENA COSMETICS, INC.'S OPPOSITION TO PLAINTIFFS ALLERGAN, INC.
AND MURRAY A. JOHNSTONE, M.D.'S OPENING CLAIM CONSTRUCTION BRIEF

1   (citing *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1551(Fed. Cir. 1996)).

2   Because "optionally substituted" is the only "optional" limitation explicitly recited, no

3   other "optional" limitations, such as Allergan's proposed "may or may not have one or

4   more hetero atoms" language, are allowed by the claims.

5        Allergan next attempts to support its reading by reference to the specification,

6   which, in describing "D," discloses that the chain of carbon atoms may be "optionally

7   interrupted by preferably not more than two hetero atoms (O, S, or N), . . . ."  (Ex. __,

8   '105 patent, col. 10:40-42)  Allergan asserts that this language in the specification must be

9   read into the construction of "D" as defined in the claims.  Unfortunately for Allergan,

10  this has it exactly backwards.  Allergan may not rewrite the claim language to cover

11  unclaimed embodiments disclosed in the specification. *See Helmsderfer v. Bobrick*

12  *Washroom Equip., Inc*., 527 F.3d 1379, 1383 (Fed. Cir. 2008) (Court refused to rewrite

13  claim language to encompass the preferred embodiment or other illustrated embodiments)

14  The Federal Circuit precedent "is replete with examples of subject matter that is included

15  in the specification, but is not claimed."  *TIP Sys., LLC. v. Phillips & Brooks /Gladwin,*

16  *Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("Indeed, read in the context of the

17  specification, the claims of the patent need not encompass all disclosed embodiments.")

18  (citing *Schoenhaus v. Genesco, Inc.,* 440 F.3d 1354, 1359 (Fed. Cir. 2006)).  Thus, pace

19  Allergan, the specification is <u>not</u> the definition of the D chain.  The definition of the D

20  chain is set forth in the claims, not the specification, and the claim quite clearly does not

21  provide for the interruption of the chain by one or more heteroatoms.  (Merlic Decl., ¶

22  __); *See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed.

23  Cir. 1989) ("A claim in a patent provides the metes and bounds of the right which the

24  patent confers on the patentee to exclude others from making, using, or selling the

25  protected invention.)

26        Indeed, Johnstone certainly knew how to claim heteroatoms as part of a chain of

27  carbon atoms.  First, the portion of the specification cited above demonstrates that

28

DEFENDANT ATHENA COSMETICS, INC.'S OPPOSITION TO PLAINTIFFS ALLERGAN, INC.
AND MURRAY A. JOHNSTONE, M.D.'S OPENING CLAIM CONSTRUCTION BRIEF

1    Johnstone could easily have claimed a chain interrupted by heteroatoms by duplicating the

2    "optionally interrupted" language from the specification into the claims.  His decision not

3    to do so must be respected by this Court; it would be error to do otherwise.  *See*

4    *Helmsderfer v. Bobrick Washroom Equip., Inc*., 527 F.3d at 1383 (Court refused to

5    rewrite claim language to encompass the preferred embodiment or other illustrated

6    embodiments).  Accordingly, Johnstone's failure to state that the chain of 1-10 carbon

7    atoms in "D" could be interrupted by one or more heteroatoms precludes the Court from

8    now expanding the scope of the claim under the guise of claim construction.  *Id*.

9         Allergan' reliance on the specification to attempt to graft the heteroatom

10   interruption language into the claim is particularly rich given that the '105 patent is little

11   more than a hodgepodge of excerpts cut and pasted directly from various prior art patents,

12   most of which were issued to Johan W. Stjernschantz ("Stjernschantz").  (*See* Ahn Decl.,

13   __, Ex. __).   For example, U.S. Patent No. 5,578,618 ("'618 patent") naming

14   Stjernschantz as an inventor is referenced as prior art in the specification of the '105

15   patent.  (Ex. __, '105 patent, col. 4:20-27).  Thus, the usage reflected in the '618 patent

16   may provide useful guidance concerning similar terms used in the '105 patent – indeed, it

17   is considered to be intrinsic evidence.  *See Vitronics Corp. v. Conceptronic*, *Inc.*, 90 F.3d

18   1576, 1584 (Fed. Cir. 1996) ("In addition, a court in its discretion may admit and rely on

19   prior art proffered by one of the parties, whether or not cited in the specification or the file

20   history. This prior art can often help to demonstrate how a disputed term is used by those

21   skilled in the art."); *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed.

22   Cir. 2005) ("This court has established that "prior art cited in a patent or cited in the

23   prosecution history of the patent constitutes intrinsic evidence.").  Moreover, vast portions

24   of the '618 patent specification, including the paragraph describing the "D" chain, were

25   apparently copied nearly word for word into the specification of the '105 patent.

26   (compare: '105 patent, col. 9:1-10:67; '618 patent, col. 2:57-4:19).  Thus, for this

27   additional reason, the '618 patent should guide this Court in construing the nearly

28

1  identical language of the claims.

2      The '618 patent leaves no room for doubt that the heteroatom interruption must be

3  explictly recited in order to encompassed by the claim. Claim 1 of the '618 patent recites,

4  in part:

5      and in which the omega chain of the prostaglandin has the formula

6      $C_{13} - B - C_{14} - D_{15-24} - R_2$

7      wherein

8      C is a carbon atom (the number according to standard prostaglandin nomenclature

9      being indicated by the subscript);

10     B is a single bond, a double bond, or a triple bond;

11     D represents a sub-chain of 1-10 carbon atoms with substituents on each carbon

12     atom that are selected from the group consisting of a hydrogen atom, an alkyl

13     group, an oxo group and a hydroxyl group, and

14     $R_2$ is an aromatic heterocyclic group having 5-6 ring atoms.

15 (Ahn Decl., __, Ex. __, '618 patent, col. 19:59-20:7). Like Claim 1 of the '105 patent,

16 Claim 1 of the '618 patent does not recite the heteroatom interruption limitation and is

17 thus not encompassed by the claim. Example 1 of Table 1 of the '618 patent and Example

18 1 of Table 1 of the '105 patent, respectively represent embodiments of Claim 1 of the '618

19 patent and Claim 1 of the '105 patent. (Ex. __ ['618 Patent])

20     Claim 8 of the '618 patent, on the other hand, recites in part:

21     and in which the omega chain of the prostaglandin has the formula

22     $C_{13} - B - C_{14} - D_{15-24} - R_2$

23     wherein

24     C is a carbon atom (the number according to standard prostaglandin nomenclature

25     being indicated by the subscript);

26     B is a single bond, a double bond, or a triple bond;

27     D represents a sub-chain of 1-10 carbon atoms **and 1-2 heteroatoms selected from**

28     **the group oxygen, sulfur, and nitrogen**, with substituents on each carbon atom

1    that are selected from the group consisting of a hydrogen atom, an alkyl group, an

2    oxo group and a hydroxyl group, and

3    $R_2$ is an aromatic heterocyclic group having 5-6 ring atoms.

4  (Ahn Decl., __, Ex. __, '618 patent, col. 21:1-20) (emphasis added); *see also* (Ahn Decl.,

5  __, Ex. __, p. 32).  Unlike the claims of the '105 patent, Claim 8 of the '618 patent

6  explicitly recites language encompassing the heteroatom interruption limitation.  It is

7  readily apparent that Stjernschantz wrote Claims 1 and 8 separately to encompass (1)

8  those embodiments without heteroatom interruptions in the "D chain" in Claim 1, and (2)

9  those embodiments with heteroatom interruptions in the "D chain" in Claim 8.  However,

10  Johnstone either intentionally or unintentionally omitted the parallel claim from the '105

11  patent.  Therefore, while Claim 8 of the '618 patent encompasses structure 4 in Table 1 of

12  the '105 patent, the claims of the '105 patent do not.  Johnstone's cut-and-paste approach

13  to claims drafting did not serve him well, because he failed to claim the embodiment

14  disclosing the heteroatom interruption in the "D" chain.

15    Furthermore, Allergan's reliance on *Pfizer, Inc. v. Teva Pharms. USA, Inc.,* 429

16  F.3d 1364 (Fed. Cir. 2005) is puzzling.  *Pfizer* certainly does not stand for point that

17  Allergan seems to argue, that the patentee must explicitly disavow or disclaim the subject

18  matter in order for it to be dedicated to the public.  Dedication to the public does not

19  require disavowal or disclaimer.  In *Pfizer*, the Federal Circuit stated that "if one of

20  ordinary skill in the art can understand the unclaimed disclosed teaching upon reading the

21  written description, the alternative matter disclosed has been dedicated to the public."

22  *Pfizer,* 429 F.3d at 1378 (quoting *PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.,* 355

23  F.3d at 1353.)  The heteroatom interruption limitation was dedicated to the public, for the

24  simple reason that it was plainly disclosed in the specification but not recited in the claims

25  themselves.  Nothing could be more clear.  (Merlic Decl.)  As this is the very exemplar of

26  an unclaimed embodiment dedicated to the public, Allergan cannot now attempt to

27  recapture the dedicated subject matter under the guise of claim construction.  *See*

28  *Helmsderfer v. Bobrick Washroom Equip., Inc*., 527 F.3d at (refusing to rewrite claim

1   language to encompass the preferred embodiment or other illustrated embodiments).

2   Indeed, Allergan admits that the '105 patent specification describes the embodiment with

3   a heteroatom interruption.  (Ex. __, '105 patent, col. 11:1-40)  Because the text of the

4   specification as well as structure 4 shown in Table 1 of the '105 patent specify an

5   embodiment having the heteroatom interruption in the "D" chain, Allergan cannot

6   credibly argue that this embodiment was not identified in the specification, and thereby

7   not dedicated to the public.

8          Allergan's final argument here is the claims permit the addition of any oxygen atom

9   between the D and $R_2$ elements of the omega chain.  However, the text of the claims does

10  not support this proposition.  The omega chain is defined in the claims as follows:  C-B-

11  C-D-$R_2$.  The lines running from one element to the next denote direct bonds between the

12  elements.  This diagrammatic definition of the claimed compound does not permit the

13  arbitrary addition of unspecified atoms between the elements, because one of skill in the

14  art would not read it so.  (Merlic Decl.)  In chemistry, dashes do not represent unrecited

15  intervening atoms between recited atoms – dashes represent bonds between atoms or

16  groups.  (Merlic Decl., __)  If it were otherwise, the definition of the omega chain would

17  be unbounded and therefore indefinite, as the omega chain could contain literally any

18  number or configuration of unspecified types of atoms so long as it merely contained a

19  few carbon and hydrogen atoms to fulfill the definitions of C, D and $R_2$.  (Merlic Decl.)

20         In light of this fact, the two cases that Allergan relies on are easily distinguishable.

21  First, Allergan's reliance on *Genentech, Inc. v. Chiron Corp.,* 112 F.3d 495 (Fed. Cir.

22  1997) is misplaced because it compares apples to oranges.  Conventions used to describe

23  bonds between atoms in chemistry – which, as shown above, preclude the type of stealth

24  interruptions that Allergan seeks to incorporate – are not analogous to conventions

25  describing nucleotide sequences.  (Merlic Decl., __).  Allergan's construction of the

26  dashes renders the entire claim language indefinite under 35 U.S.C. § 112, ¶ 2 and

27  boundless beyond comprehension.  Second, Allergan blatantly misleads this Court by

28

relying on *Oatey Co. v. IPS Corp.,* 514 F.3d 1271 (Fed. Cir. 2008) for the spurious proposition that "Federal Circuit authority requires that to exclude the disclosed embodiments from the claims, the intrinsic record must show that 'those embodiments are *clearly disclaimed . . . .*" Allergan misses the point. *Oatey* holds that the Federal Circuit has "interpreted claims to exclude embodiments of the patented invention where those embodiments are clearly disclaimed in the specification." *Oatey Co. v. IPS Corp.,* 514 F.3d at 1277. However, this does *not* stand for the proposition that a disclaimer is *required* to exclude embodiments from the scope of claims. *See Helmsderfer v. Bobrick Washroom Equip., Inc*., 527 F.3d 1379, 1383 (Fed. Cir. 2008) (refusing to rewrite claim language to encompass the preferred embodiment or other illustrated embodiments). *Helmsderfer* excluded even the preferred embodiments without a disclaimer.

Finally, Allergan's construction of the "D chain" remains unclear because "a chain of one to ten carbon atoms" is not sufficient to apprise a person of ordinary skill in the art as to whether the chain is open or closed. Although Allergan argues that "having" must be open ended, that position is not clearly incorporated into Allergan's construction of the "D chain." Moreover, even Allergan's own proposed construction, *i.e.* "a chain of one to ten carbon atoms," requires the chain to be closed-ended. This is because it still suffers from the same crucial defect identified above: that subsequent language "which may or may not have one or more hetero atoms (oxygen, sulfur and/or nitrogen) as a part of the chain" is rendered entirely superfluous if the chain is open-ended.

## B. "the formula [insert picture]" (claims 1, 5 & 9)

Allergan yet again proffers a construction that directly contradicts the recitation of the claim. Despite the clear depiction in the diagram of a chain consisting specifically of seven carbon atoms, Allergan maintains that the chain may have six to ten carbon atoms. As shown in Athena's opening brief, this is incorrect; the diagram clearly shows exactly seven carbon atoms, and that is the length of the pertinent portion of the alpha chain. Thus, one of ordinary skill in the art would understand that the portion of the alpha chain

1    between the cyclopentyl ring and R$_1$ (including the C1 carbon) <u>must</u> consist of exactly

2    seven carbon atoms which includes a double bond at the C5-C6 position and (-COO-) as

3    the C1 position.  (Merlic Decl. ¶ __).  This is so regardless of whether the specification

4    might have disclosed some unclaimed embodiments.

5         Here again, the '618 Patent provides useful guidance.  Unlike in the '105 Patent, the

6    <u>claims</u> of the '618 Patent actually include the language "the alpha chain of the

7    prostaglandin comprises *a chain of 6 to 10 carbon atoms.*"  With minimal effort,

8    Johnstone could crafted claims 1, 5 and 9 of the '105 Patent to recite an alpha chain of 6

9    to 10 carbon atoms, just as in the '618 Patent, but chose not to do so.  Thus, this Court

10    should construe the claim as written and reject Allergan's attempt to redraft the claims to

11    cover embodiments that were never claimed.  *See Helmsderfer v. Bobrick Washroom*

12    *Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008).

13         **C.**    <u>**"The method of claim 1" and "The method of claim 5"**</u>

14         35 U.S.C. § 112, ¶ 3 provides for three distinct types of claiming: "[a] claim may be

15    written in independent or, if the nature of the case admits, in dependent or multiple

16    dependent form."  An independent claim stands on its own and does not refer to any other

17    claim in the patent.  *Lampi v. Am. Power Products, Inc.*, 65 F. Supp. 2d 757, 761 (N.D.

18    Ill. 1999)  A dependent claim, as set forth in 35 U.S.C. § 112, ¶ 4, contains a reference to

19    a claim previously set forth and specifies a further limitation of the subject matter

20    claimed.

21         In an apparent attempt to preserve the validity of claims 3 and 7, Allergan contends

22    that claims 3 and 7 can refer to merely part of independent claims 1 and 5, without being

23    treated as dependent claims.  Tellingly, Allergan is unable to cite to any authority

24    supporting its novel theory of patent claiming.  Indeed, the U.S. Patent and Trademark

25    Office has never approved the practice of having a claim refer to but part of another claim.

26    *See Zenith Radio Corp. v. Lehman*, 121 F.Supp. 69 (S.D.N.Y. 1954).

27         To the contrary, it is well accepted that claims which make use of the phrase "the

28

DEFENDANT ATHENA COSMETICS, INC.'S OPPOSITION TO PLAINTIFFS ALLERGAN, INC.
AND MURRAY A. JOHNSTONE, M.D.'S OPENING CLAIM CONSTRUCTION BRIEF

method of claim 1, wherein…" are dependent claims. *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1377 (Fed. Cir. 2007); *In re Comiskey*, 554 F.3d 967, 971 (Fed. Cir. 2009); *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 874 (Fed. Cir. 2008); *Kao Corp. v. Unilever United States, Inc.*, 441 F.3d 963, 965-66 (Fed. Cir. 2006) In *Robotic Vision Systems*, a case cited by Allergan, the court rejected the argument that claims 11 and 12, claims beginning with the phrase "a method as described in claim 1, in which…" were not claims depending from claim 1. *Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 189 F.3d 1370, 1376 (Fed. Cir. 1999) As the Federal Circuit stated, "claims 11 and 12 are dependent claims of claim 1 and are to be construed to incorporate by reference all the limitations of claim 1." *Id.* Indeed, a dependent claim, by definition, incorporates by reference all limitations of the claim to which it refers. 35 U.S.C. § 112, ¶ 4.

Furthermore, the cases that Allergan cites also fail to support its position. Allergan first points to *Pfizer*, arguing that the court left open the question of whether the claim 6, as drafted could be construed as an independent claim. The claim at issue, claim 6, read: "The hemicalcium salt of the compound of claim 2." The Federal Circuit did directly address the issue of whether claim 6, as written, could be an independent claim. As the court stated, "Indeed, claim 6 could have been properly drafted either as dependent from claim 1 or as an independent claim – i.e., "the hemicalcium salt of atorvastatin acid." *Pfizer, Inc. v. Ranbaxy Labs, Ltd.*, 457 F.3d 1284, 1291-92 (Fed. Cir. 2006). The court in *Pfizer* rejected the argument that claim 6 was a dependent claim, based not on the language of claim 6, but because claim 6 did not specify a further limitation of the subject matter of the claim to which it refers. That situation does not apply to the claims at issue here. Moreover, the Federal Circuit demonstrated in *Pfizer* how dependent claim 6 could be redrafted to be independent: it could be redrafted to remove the reference to another claim.

*Ex parte Porter* likewise does not support Allergan's attempt to create a new form

of claiming.  In *Porter*, the claim at issue, claim 6, read: "A method for unloading non-packed, non-bridging and packed, bridging flowable particle catalyst and bead material from the opened end of a reactor tube which comprises utilizing the nozzle of claim 7." *Ex parte Porter*, 25 U.S.P.Q.2d 1144, 1145 (B.P.A.I. 1992).  The Board found that claim 6 could be construed as an independent claim, drafted in short-hand format to avoid rewriting the particulars of the nozzle recited in claim 7.  However, the entirety of claim 7 described the nozzle, as claim 7 reads: "A nozzle, suitable for use in discharging a controlled stream of fluid into a reactor tube of a catalyst unloading apparatus for removing non-packed, non-bridging, and packed bridging flowable catalyst and bead material from within the reactor tube, said nozzle comprising: a main channel running medially along the length of said nozzle…; and a plurality of unevenly spaced smaller fluid discharge openings positioned around the circumference of said nozzle..."  As the entirety of claim 7 was used to describe the nozzle, claim 6 was construed as an independent claim that incorporated the entirety of claim 7.  *Ex parte Porter* does not support Allergan's contention that it is proper for a claim referencing another claim to incorporate merely a part of the base claim.  On the contrary, *Ex parte Porter* demonstrates that claims 3 and 7 incorporate the entirety of claims 1 and 5.

Even if Allergan's novel theory of claiming were legally permissible, Allergan's proposed construction would flout the requirement that claims be construed as a person of ordinary skill in the art would understand them.  Each claim is an entity which must be considered as a whole.  *General Foods Corp. v. Studiengesellschaft Kohle*, 972 F.2d 1272, 1274 (Fed. Cir. 1992)  A portion of a claim, in and of itself, does not "claim" subject matter.  *Id.*  As the Federal Circuit stated in *General Foods*, "a claim to a process comprising the step A followed by the step B followed by the step C defines, as a matter of law, only the A-B-C process and one cannot properly speak of any single step as being 'claimed'…all that is claimed is the process consisting of the *combination* of all three steps."  *Id.*  Likewise, "the method" that is claimed by claims 1 and 5 is not merely the

preamble, the method is comprised by all of the limitations present in each claim. Furthermore, the meaning of a claim term is that which would be understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1313. Professor Merlic, reading claims 1 and 5, understands that the method disclosed in each of these claims comprises the steps recited in the limitations, not merely the language of the preamble. (Merlic Decl. ¶ ) If the method disclosed by claim 1 and claim 5, and incorporated into claim 3 and claim 7 as proposed by Allergan, merely referred to the preamble, these claims would be unbounded and incomprehensible to one of skill in the art, thus invalid for indefiniteness. *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008)

Third, Allergan's suggestion that this Court may ignore the rules of claim construction in order to preserve the validity of these claims is incorrect. The Federal Circuit has repeatedly stressed that this is something that the Courts are not permitted to do. *Phillips*, 415 F.3d at 1327-28; *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1304 (Fed. Cir. 2005) Even the case relied upon by Allergan states that the inquiry into invalidity is limited: "if the only claim construction that is consistent with the claim's language and the description renders the claim invalid, then the axiom does not apply and the claim is simply invalid." *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999)

Fourth, Allergan's speculation concerning how the PTO examiner "would have likely" construed these claims is just that – speculation, not evidence. There is nothing in the prosecution file to suggest that the examiner even considered this issue. Accordingly, speculation concerning the examiner's subjective thoughts concerning the application is immaterial to the construction of the claims. *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1342 (Fed. Cir. 2001); *Prima Tek II, L.L.C. v. Polypap*, S.A.R.L., 318 F.3d 1143, 1151 (Fed. Cir. 2003) Unlike Allergan, Athena has submitted actual evidence concerning how one of skill in the art would construe this claim language. (Merlic Decl. ¶__) The Court should,

1   accordingly, reject Allergan's novel invitation to reversible error.

2       **D.    "a PGF2α derivative" (claims 3 & 7)**

3       Allergan contends that there are two disputes regarding this term.  However,

4   Allergan's first dispute – whether the scope of claim 3 is broader than that of claim 1 –

5   misses the point.  The issue is not whether one claim is broader than the other, but rather

6   whether one of skill in the art would understand the "metes and bounds" of the specific

7   claim language at issue.  Here, as shown below, the skilled artisan would not read the term

8   as proposed by Allergan.  The issue of relative breadth then goes to the validity of claim 3

9   – an issue that is not now before the Court.  Allergan's second dispute – whether a "$PGF_{2\alpha}$

10  derivative" must be synthesized from certain starting materials – is yet another straw man

11  argument that mischaracterizes Athena's position.

12      Allergan's argument for a narrow definition of "$PGF_{2\alpha}$ derivative" rests on a series

13  of citations from the specification.  However, while the specification does identify

14  examples of what it refers to as "prostaglandin derivatives," it nowhere purports to define

15  the term "$PGF_{2\alpha}$ derivative."  This is not surprising, because the disclosure of the '105

16  Patent is not limited to $PGF_{2\alpha}$ derivative.  Rather, the patent discusses prostaglandin

17  derivatives more generally, and indeed states that the group of preferred prostaglandin

18  derivatives includes derivatives of $PGA_2$, $PGE_2$ and $PGF_{2\alpha}$.  (Ex. _ ['105 Patent, col.

19  16:51-53)  In other words, it is unclear that Allergan's examples from the specification

20  refer to $PGF_{2\alpha}$ derivatives, or some other type of prostaglandin derivative.  Second, and

21  more fundamentally, the portions of the specification to which Allergan cites merely

22  provide examples; they do not provide definitions.  Thus, at column 16, the patent states

23  that "<u>any</u> alkyl ester of the prostaglandin derivatives . . . for instance methyl, [a list of

24  alkyl esters], <u>may be</u> used in the practice of the invention."  (Ex. _ ['105 Patent, col.

25  16:31-38) (emphasis added)  The patent does not say that the prostaglandin derivatives

26  within the scope of the patent are limited to those with an alpha chain having esters falling

27  within the scope of the example; quite the opposite, the patent plainly states that these are

28

only examples of what may be used in the practice of the invention, and that "any" alkyl
ester – presumably with no specified upper limit on the number of carbon atoms in the
ester – may be used.  Indeed, the invention is not even limited to alkyl esters – again, this
is just an example.

Similarly, with the omega chain, Allergan cites to a portion of the specification that
references prior art phenyl ring structures.  However, here again the specification provides
only examples, and not a definition, of "derivatives," which may or may not be "$PGF_{2\alpha}$
derivatives."  While these examples may provide guidance as to some portion of what
falls within the scope of the term "prostaglandin derivative," they fall far short of defining
the bounds of the term "$PGF_{2\alpha}$ derivative."

Accordingly, the term is construed as one of skill in the art would understand it.
Unfortunately for Allergan, the only evidence on point as to this issue – including the
testimony of Allergan's own expert – demonstrates that one of skill in the art would have
no idea of what the bounds of the term are.  The term "derivative" changes the scope of
"$PGF_{2\alpha}$," but is not defined anywhere in the patent, so it is unclear as to what extent the
term "$PGF_{2\alpha}$" is modified by "derivative."  (Merlic Decl.)  Although the specification
provides some examples of what Johnstone considered a prostaglandin derivative in Table
1 of the '105 patent, a person of ordinary skill in the art would not know where the limits
of "$PGF_{2\alpha}$ derivative" would be.  (Merlic Decl. ¶ 11)

Tellingly, even Allergan's expert testified that he did not know the bounds of the
term "$PGF_{2\alpha}$ derivative."  Initially, Allergan's expert took the position that a "$PGF_{2\alpha}$
derivative" refers only to modifications in the omega chain of a molecule.  (Ex. 5, Burk
Depo. 19:7-30:25).  Of course, this flatly contradicts Allergan's current position, which is
that the term also encompasses modifications to the alpha chain.  However, he could not
say exactly what modifications those might be.  When pressed further, he finally admitted
that he had no idea what falls within the scope of the term:

Q:     And my question is, are there any other molecules that fall within the

1    scope of the term PGF2 alpha derivative as it is used in the claims of

2    the '105 patent, other than those molecules that specifically shown in

3    Table 1 of the '105 patent?

4    A:    I don't know.

5    (Ex. 5, Burk Depo. 23:15-25)  In addition, when Burk was asked if he knew the difference

6    between the scope of claims 1 and 3, he stated, "I don't know."  (Ex. 5, Burk Depo. 30:7-

7    19).  Moreover, when asked for the meaning of "derivative," Allergan's counsel instructed

8    Burk not to answer on the ground that it was outside the scope of his declaration, an

9    obstructive tactic used liberally throughout Burk's deposition.  (Ex. 5, Burk Depo. 31:5-

10    18).  Although Burk was able to identify some examples of a $PGF_{2\alpha}$ derivative (simply

11    pointing to molecules that were so described in the patent), his inability to provide any

12    specifics regarding the "modifications" that might identify a $PGF_{2\alpha}$ derivative or, indeed,

13    to identify any molecules at all besides those specifically referenced as such in the patent

14    demonstrates the boundless nature of this term.  Allergan's obstructive tactic of shielding

15    its purported expert from discovery concerning the very matter that he was proffered to

16    testify on – claim construction – by preventing its witness from answering the basis of

17    spurious privilege objections highlights the lack of any real support for Allergan's

18    positions in this litigation.

19    **E.    "[A] derivative giving the final substance equivalent properties as a hair**

20    **growth stimulating agent" (claims 5 & 9)**

21    The term "a derivative giving the final substance equivalent properties as a hair

22    growth stimulating agent" is indefinite, and therefore invalid.  35 U.S.C. § 112, ¶ 2.  As

23    explained in *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008),

24    "[i]ndefiniteness is a matter of claim construction, and the same principles that generally

25    govern claim construction are applicable to determining whether allegedly indefinite

26    claim language is subject to construction." (citing *Datamize, LLC v. Plumtree Software,*

27    *Inc.*, 417 F.3d 1342, 1348 (Fed. Cir. 2005).  "When a limitation is ambiguous as to the

28    presence of absence of an upper bound, an inquiry into the definiteness of that limitation

1    is warranted." *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1253 (Fed.

2    Cir. 2008); *see also Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342

3    (Fed. Cir. 2003) ("Ambiguity in claim scope is at the heart of the definiteness requirement

4    of 35 U.S.C. § 112, ¶ 2").

5         Here, both the intrinsic and extrinsic evidence compels the conclusion that the

6    phrase "<u>a derivative giving the final substance equivalent properties as a hair growth</u>

7    <u>stimulating agent</u>" is indefinite, and that therefore claims 5 and 9 are invalid.  First, the

8    phrase itself is ambiguous.  Based on the way the claim is drafted, the term "derivative"

9    allows for an infinite number of different permutations.  (Merlic Decl. ¶ __)  Therefore,

10   one of skill in the art would not be able to ascertain the metes and bounds of the claim.

11   (Merlic Decl. ¶ __)  In addition, Allergan's own proposed construction bolsters Athena's

12   argument that the term is indefinite.  Allergan's construction only further obscures the

13   scope of this claim.  For example, it is unclear from Allergan's construction how many

14   carbon atoms are in the chain and what is meant by the terms "similar way" and

15   "structurally similar."

16        Allergan contends that "[t]he phrase requires two things: (1) the alpha chain must

17   be a derivative of the described alpha chain and (2) the compound must have hair growth

18   properties equivalent to those of a compound with the specifically described alpha chain."

19   (Allergan's Opening Brief at 29:18-20)  Unfortunately for Allergan, the first point is

20   incorrect, and the second merely restates and incorporates the vagueness of the claim

21   language.  Allergan's position is curious.  While it agrees that "a derivative" refers to an

22   entire molecule rather than a portion of a molecule, Allergan also argues that this term

23   only modifies the alpha chain of the compound, which is only a portion of a molecule.

24   (Allergan's Opening Brief at 30:6-7; Ung Decl. ¶__, Merlic Depo at 81:4-24)

25        Second, while the phrase appears in two locations in the specification, in neither

26   instance is there any explanation as to what the phrase means.  ('105 Patent col. 10:4-17;

27   col. 5:49-60)  Instead, the phrase is simply repeated four times, twice in the specification

28   and twice in the claims.  Therefore, the specification provides no guidance to the skilled

artisan as to the bounds of the phrase.

Third, not only Prof. Merlic but also Allergan's claim construction expert, Dr. Burk, admits that even he has no idea what this phrase means:

> Q:     Okay.  Let's turn to claim 5 of the 105 patent, and that's still in
> column 26, and let's go down to lines 51 to 52.
>
> And there's a text in claim 5 referring to a derivative
> giving the final substance equivalent properties as a hair growth
> stimulating agent.
>
> Do you see that?
>
> A:     Yes.
>
> Q:     Okay. Do you have any idea what that language means?
>
> A:     No.

(Burk Depo. Tr. 73:13-25)  Dr. Merlic is also unable to determine the meaning of this language because the claim does not provide the starting point from which the derivative is derived.  (Merlic Decl. ¶__)  In order to determine whether something is a "derivative," one would need to do compare compounds, which would necessarily require the parent compound.  (Merlic Decl. ¶__)  However, as drafted, it is not possible for one of skill in the art to define the subset of derivatives which would be covered by this claim.  (Merlic Decl. ¶__)  Thus, both Allergan's and Athena's experts agree that a person of ordinary skill in the art is not able to ascertain the metes and bounds of this phrase.   (Merlic Decl. ¶__)

However, if the Court finds that this term is amenable to construction, it should not construe the term as proposed by Allergan.  Athena agrees with Allergan that it makes no sense to call for a derivative of only a single element of the compound – yet that is exactly what the claims recite ("R1 is . . . a derivative . . . .").  While Allergan purports to construe this claim term, in reality it proposes a construction of "[a]ny PGF compound" with certain characteristics – clearly not what is contemplated by the phrase as recited in claims 5 and 9.  Moreover, Allergan proposes that the term modifies the alpha chain of the

molecule, which, like $R_1$, is also only a subpart of the compound. Allergan's argument that this Court should adopt its proposed construction because the alpha chain is a slightly larger subpart than $R_1$ is nonsensical.

Allergan argues that the claim language "broadens the scope of the claim to cover compounds with alpha chains other than those specifically described" in claims 5 and 9, but this is based on nothing more than two choice phrases taken out of context. Tellingly, Allergan ignores Table 1, which consists of "representative derivatives useful in the practice of the invention." ('105 Patent, col. 10:65-col.15:40) Allergan fails to demonstrate how its proposed construction comports with the thirty examples listed in Table 1, which illustrate modifications only at $R_1$.

Moreover, Allergan's argument that if "$R_1$ in the derivative remains an alkyl group or a hydrogen atom, then the phrase becomes meaningless" is a non sequitur. Under that same logic, Athena could argue that if the alpha chain is as depicted in the claim, but $R_1$ is not H or an alkyl group of less than 10 carbon atoms, then the term "derivative" would be meaningless under Allergan's proposed construction. However, such arguments do not shed any light on the proper construction of the term "a derivative . . . ." Rather, as explained above, the claims and the specification clearly teach one skilled in the art that the alpha chain must be a seven-carbon chain consisting of the (-COO-) group at the C1 position, a double bond at the C5-C6 position and an alpha configuration at the C7-C8 position. The patent claims and specification of the '105 patent limit the structure of the alpha chain, but allow for modifications to $R_1$.

## IV.    CONCLUSION

The Court should adopt Athena's constructions of the claim terms in dispute.

Dated: March 13, 2009                          GRAVES LAW OFFICE, P.C.

                                               /s/Philip J. Graves
                                               Philip J. Graves
                                               Attorneys for Defendant
                                               Athena Cosmetics, Inc.

DEFENDANT ATHENA COSMETICS, INC.'S OPPOSITION TO PLAINTIFFS ALLERGAN, INC.
AND MURRAY A. JOHNSTONE, M.D.'S OPENING CLAIM CONSTRUCTION BRIEF